IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 05-CR-378 |
| | : | |
| KHASHIFF GREGORY | : | |
| | : | |

**ORDER**

**AND NOW**, this ___4th____ day of _____April_____, 2006, upon consideration of Defendant's Motion to Suppress Evidence (Doc. # 24), the Government's response (Doc. # 32), and the parties' submissions at oral argument before this Court on March 21, 2006, it is **ORDERED** that Defendant's motion is **DENIED**. The Court makes the following Findings of Fact and Conclusions of Law.

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to:

O:\ABB 2006\Gregory Suppression opinion 4_3_06.wpd

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Generally, "the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, such as that the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." <u>United States v. Johnson</u>, 63 F.3d 242, 245 (3d Cir. 1995) (internal citations omitted).

### STOP OF DEFENDANT AND SEARCH/SEIZURE OF ITEMS ON JANUARY 13, 2005

### Findings of Fact

- Police Officers Michael Winkler ("Winkler"), Jerald Furey ("Furey"), and Robert Conway ("Conway") are Philadelphia police officers.
- On January 13, 2005, at around 9pm, Winkler was assigned to the 17th district in Philadelphia, where he was patrolling alone in a marked car (Car 1715), in uniform.
- At approximately 8:49pm, Winkler was traveling southbound on South 31st Street toward the intersection of 31st Street and Reed Street.
- Winkler saw a silver/gray Buick Park Avenue traveling westbound on Reed Street toward the intersection.
- When Winkler was about a car length away from the Buick, he observed the Buick fail to stop at the stop sign on 31st and Reed.
- Winkler turned right and pulled behind the Buick, put on his flashing lights and signaled the driver of the Buick to pull over.
- The driver pulled over in the middle of the 3300 block of Reed Street.
- Winkler approached the driver's-side door of the Buick and noticed that the driver was the only occupant of the car.
- The driver was later identified to be the defendant, Khashiff Gregory.
- The defendant rolled down the window and Winkler asked him for identification.
- The defendant presented a Pennsylvania driver's license with his picture and the name "Nasir Jones."
- Winkler noticed a bulge near the defendant's right hip and asked him about the bulge.
- The defendant responded that it was his cell phone, and Winkler asked to see it.
- The defendant lifted up his shirt and twisted his right hip toward Winkler to show him his cell phone.
- Winkler observed a cell phone attached to the defendant's waistband over his right pants pocket.
- Winkler also observed the sights, receiver, and part of the action of a semi-automatic handgun protruding from the defendant's right pants pocket.
- Winkler informed the defendant that he was going to recover the gun from him, opened the door, leaned into the car, and reached across the defendant to retrieve the gun.
- At this point, a struggle ensued which involved the defendant putting the car in drive and trying simultaneously to push Winkler out of the open car door and keep Winkler from

- taking the gun, Winkler sitting on the defendant's lap trying simultaneously to retrieve the gun and put the car in park.[1]
- At some point, Winkler drew his own gun, pointed it at the defendant's face and chest, and ordered defendant to stop reaching for the gun in defendant's pocket.
- By this time, officers Conway and Furey, who had been patrolling the area in their police car, noticed Car 1715 parked behind the defendant's Buick.
- Conway and Furey approached in their car to see if Winkler needed assistance.
- They observed that Winkler was in a struggle with the defendant in the front seat of the Buick.
- They exited their car and approached the Buick on foot; Conway went toward the driver's side and Furey toward the passenger's side.
- They observed the vehicle start moving and roll between 20 and 40 feet down the street.
- They observed the defendant with his right hand near his right pants pocket, Winkler with his right hand on defendant's right hand, and Winkler with his own gun drawn in his left hand pointing it at the defendant, telling the defendant "Don't do it."
- They heard Winkler announce that the defendant had a gun.
- The three officers were able to put the car in park and subdue the defendant.
- Winkler recovered a loaded handgun from the defendant's right pants pocket. (Ex. GS-14.)
- The officers also recovered a bullet-proof vest with a trauma plate that the defendant was wearing (Ex. GS-18) and 2 cell phones (Ex. GS-17).
- The defendant was placed under arrest, handcuffed, and placed in the police car.
- Thereafter, Winkler found a ball of marijuana (Ex. GS-16), a number of sandwich bags (Ex. GS-15), and a ski mask (Ex. GS-20) underneath the defendant's jacket on the front passenger seat of the Buick.
- Winkler issued the defendant a traffic ticket for disregarding a stop sign (Ex. GS-27).[2]

---

[1] Substantial testimony at the suppression hearing centered around whether Winkler should have reached into the car to retrieve the gun, in light of the potentially dangerous struggle that resulted. However, as detailed in my conclusions of law below, it is irrelevant for purposes of this motion whether Winkler could have retrieved the gun in some other way, so long as the manner in which he retrieved it was not unreasonable under the Fourth Amendment.

[2] I do not make any findings of fact with respect to the following issues raised at the suppression hearing that are not material to the decision of this motion: (1) Winkler's testimony at suppression hearings in prior, unrelated cases; (2) whether Conway and Furey had stopped the defendant a few days prior to January 13, 2005 for failure to stop at a stop sign in the same neighborhood; (3) whether the area where the events took place is a high-crime area; (4) whether there was a smell of marijuana in the Buick; (5) the existence of guns that look like cell phones; and (6) whether Conway or Furey was able to see the gun in the defendant's pocket during the struggle in the Buick.

**Conclusions of Law**

Defendant argues that the stop was unlawful under the Fourth Amendment because there existed no probable cause or reasonable suspicion to stop him.  In the alternative, defendant argues that even if the stop was lawful, there was no reasonable suspicion for the search that resulted in the seizure of the handgun and other items.  Defendant moves to suppress "all articles of evidence of every kind and description which were obtained as a result of the unlawful search of the defendant, and his car."  (Def.'s Mot. Suppress at 1.)  At the suppression hearing, I granted defendant's unopposed request to amend his motion to also seek suppression of any statements the defendant may have made to police immediately after his arrest.[3]

**Legal Standards**

Stop of Defendant

A traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations.  United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997) (citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977)).

Search of Defendant and his Car/Seizure of Items

An officer who has made a traffic stop may exercise reasonable superintendence over the car and its passengers.  United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004).  This may include frisking a vehicle's occupants and searching the passenger compartment if the officer has reasonable suspicion that the occupants are armed and dangerous.  Id. (citing Michigan v. Long, 463 U.S. 1032, 1049-50 (1983)).  When an officer is conducting a traffic stop, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  Florida v. Royer, 460 U.S. 491, 500 (1983).

Incident to a lawful arrest, a police officer may search the entire passenger compartment of a car and any closed or open containers therein.  Belton, 453 U.S. 454, 460 (1981).

**Stop of Defendant**

Because an officer who observes a traffic violation may lawfully make a traffic stop, Moorefield, 111 F.3d at 12, and because I credit Winkler's statement that he observed the defendant failing to stop at a stop sign, the stop of the defendant was lawful under the Fourth Amendment.

---

[3] Specifically, defendant seeks to suppress any statements he may have made to the police to the effect that Nasir Jones was his brother, that he was using his brother's identification, and that he did not want his brother to get in trouble.

**Search of Defendant and his Car/Seizure of Items**

<u>Reasonable Suspicion that Occupants are Armed and Dangerous</u>

Once an officer has made a lawful traffic stop, the officer may frisk the occupants of the vehicle or search the passenger compartment if he has reasonable suspicion to believe that the occupants might be armed and dangerous. <u>Bonner</u>, 363 F.3d at 216. Here, Winkler had reasonable suspicion to believe that the defendant was armed and dangerous when he saw the gun protruding from the defendant's right pants pocket.[4] Thus, the frisk of defendant was lawful and the handgun was lawfully seized.

The defendant argues that by reaching into the car and into defendant's pants pocket to retrieve the gun, Winkler did not use the "least intrusive means reasonably available." <u>Royer</u>, 460 U.S. at 500. Defendant argues that Winkler should have ordered defendant out of the vehicle and then taken the gun from him. However, the Fourth Amendment does not establish one rigid protocol for a protective search to which an officer must adhere; it only requires that the search be reasonable under the circumstances. See <u>United States v. Baker</u>, 78 F.3d 135, 138 (4th Cir. 1996) ("the reasonableness of a protective search depends on the factual circumstances of each case . . . a patdown frisk is but one example of how a reasonable protective search may be conducted"). Here, I cannot find that under the law, Winkler's search was not reasonable under the circumstances. Winkler testified that he feels more safe reaching in and retrieving a weapon from a seated occupant of a vehicle than he would ordering the occupant out of the vehicle. Although perhaps not the most conventional or safest method for retrieving the gun, it is not unlawful. The Supreme Court has held that an officer who has reasonable suspicion that the occupant of a vehicle is armed may reach into the vehicle and remove a gun from the occupant's waistband. <u>Adams v. Williams</u>, 407 U.S. 143, 148 (1972). Thus, Winkler's search of the defendant did not exceed the permissible scope of a protective search.

Once the defendant was placed under arrest, the officers could lawfully search the defendant's person, his area of immediate control, and the entire passenger compartment of the Buick as a search incident to a lawful arrest. <u>Belton</u>, 453 U.S. at 460. Thus, the seizure of the bullet-proof vest, the cell phones, the marijuana, the sandwich bags, and the ski mask were lawful.

**Conclusion**

For the above stated reasons, the defendant's motion to suppress is denied.

---

[4] Defendant does not argue that Winkler was not permitted to ask defendant to lift up his shirt when Winkler noticed a bulge near the right pants pocket. See <u>United States v. Reyes</u>, 349 F.3d 219, 224-25 (5th Cir. 2003) (request that suspect lift shirt found reasonable where officer had reasonable suspicion that defendant was armed and dangerous); <u>United States v. Baker</u>, 78 F.3d 135, 137-38 (4th Cir. 1996) (same).